# Illinois Official Reports

## Appellate Court

---

### *People v. Blalock*, 2020 IL App (1st) 170295

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HAROLD BLALOCK, Defendant-Appellant. |
| District & No. | First District, Sixth Division No. 1-17-0295 |
| Filed Rehearing denied | September 11, 2020 October 20, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 99-CR-4956; the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Christopher L. Gehrke, of State Appellate Defender's Office, of Chicago, for appellant. |
| | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Matthew Connors, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE GRIFFIN delivered the judgment of the court, with opinion. Justices Harris and Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant Harold Blalock was tried for and convicted of first degree murder for shooting and killing Veronica Riley. During an interrogation, Blalock confessed to shooting Riley, claiming that he was trying to shoot someone else and shot her accidentally. He filed an unsuccessful appeal and two unsuccessful postconviction petitions. Blalock has since filed a third postconviction petition, which is at issue now. In his current petition, Blalock alleges that his confession was the product of improper physical coercion by detectives. The circuit court denied defendant leave to file this third postconviction petition. We conclude that the circuit court did not err when it denied defendant leave to file the operative postconviction petition, and accordingly, we affirm.

¶ 2                            I. BACKGROUND

¶ 3    On January 22, 1999, Veronica Riley was shot and killed outside a convenience store in Chicago. Chicago police officer Jeff Carter and his partner were on patrol in the area of the shooting when they heard the gunshots and responded to the scene. The officers found Ms. Riley on the floor of the convenience store. She had been shot in the back, and the bullet caused damage to her lungs and aorta, which led to her death.

¶ 4    Tara Coleman spoke to investigators and told them that she was with her young sons at a barbershop near the scene of the shooting on the day Ms. Riley was shot and killed. Ms. Coleman told investigators that defendant Harold Blalock came into the barbershop. Ms. Coleman knew defendant well because they had gone to school together. Soon after defendant arrived, two or three other men came into the barbershop and began arguing with defendant. Those men left the barbershop, and defendant left soon thereafter. Ms. Coleman saw defendant get into the passenger side of a black Pontiac when he left the barbershop. A few minutes later, Coleman heard gunshots. When she looked outside, she saw defendant in the passenger seat of the same black Pontiac he had entered minutes earlier, and he had his hands out of the window, holding a gun. Ms. Coleman did not see anyone else in the area with a gun. She identified defendant in a photo array and also in a physical line up. An assistant state's attorney took down a handwritten statement from Ms. Coleman, and Ms. Coleman signed each page of her statement averring to its accuracy.

¶ 5    Defendant was interviewed by police officers and gave a handwritten statement. Defendant indicated in his written statement that he got into an argument at the barbershop with men he knew as Rasu and Banks. The argument concerned a prior shooting with which defendant's brother was reportedly involved. After the argument, defendant left the barbershop with Marcus Carpenter and got into Carpenter's car. Carpenter gave him a gun. As they drove, defendant saw Banks, and defendant fired at him. Banks was near the convenience store where Riley was killed. Defendant saw three women near the store at the time of the shooting. Defendant claimed that he was not trying to kill anyone. Defendant's statement indicates that he was treated well by the police, that he was not threatened or promised anything in return for his statement, and that the statement was given freely and voluntarily.

¶ 6    Once the detectives had Marcus Carpenter's name from defendant's confession, they went to his residence to arrest him. Parked outside of Carpenter's residence was a two-door Pontiac Sunbird. Tara Coleman identified the vehicle from outside Carpenter's residence as the same vehicle that she saw used in the shooting.

¶ 7     Before trial, defendant filed a motion to suppress the inculpatory statements he made to investigators. Defendant alleged that the detectives "slapped, yelled at, threatened [him], and cut his fingernails." He argued that his confession was involuntary as a product of physical coercion and that it should not be permitted to be introduced at trial.

¶ 8     At the hearing on the motion to suppress, Detective John Murray testified that defendant confessed to the shooting after questioning. Detective Murray denied that any improper coercion was involved. Detective Murray testified that, after defendant confessed to the detectives, the detectives summoned an assistant state's attorney to memorialize the statement. Assistant State's Attorney Clarissa Palermo accompanied defendant while he provided a confession. She administered *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) to defendant before he gave the statement, and defendant gave his statement in the presence of Palermo and the detectives. Palermo recorded defendant's statement and then defendant signed it. Detective Murray testified that he never saw anyone abuse or threaten defendant nor did anyone yell at him. The trial court denied the motion to suppress the inculpatory statements.

¶ 9     At trial, defendant testified that after the argument at the barbershop with Rasu and Banks, he was in his own car, a red Cadillac, when he drove a few friends to a Chinese restaurant. He was parked near the convenience store when he saw Rasu heading towards him on foot. Defendant testified that he tried to drive away, but Rasu was firing a gun at him. Defendant returned fire with a gun he had in his vehicle as he drove away. Defendant kept a gun in his car because he was shot 14 times in an incident two years earlier. Defendant testified that, after the shootout, he left his car in a parking lot with the gun still inside the vehicle. Defendant stated that the car and the gun were both destroyed by a fire while it was parked in that parking lot.

¶ 10    Defendant admitted during his testimony that he did make the confessional statement that was introduced as evidence, but he denied that the statement was an accurate representation of what occurred. He testified that he tried to tell the detectives that he shot in self-defense but that he eventually relented because the detectives and the assistant state's attorney refused to believe him. Because the detectives would not accept his version of the events, defendant gave the statement that he shot at Rasu from Carpenter's car—but he left out of his statement that he was returning fire in self-defense. Defendant testified that the officers did not tell him what to say in the statement, but he testified that he was persuaded into telling the officers what they wanted to hear because they would not believe the version of events he was trying to provide to them. Defendant acknowledged in his trial testimony that no one threatened him to get him to say anything that was included in his statement.

¶ 11    Tara Coleman testified at trial. She testified inconsistently with the statement that she had given investigators shortly after the shooting. Ms. Coleman denied seeing who fired the gunshots, denied identifying defendant as the shooter, and otherwise recanted the statement she made to the assistant state's attorney and the detectives.

¶ 12    Nikki Goodman also testified for the defense. Ms. Goodman said she saw Rasu standing in the middle of an intersection firing a gun at defendant. She saw defendant return fire and drive away. Ms. Goodman testified that Rasu was firing at defendant as defendant drove away and that she then saw a lady hit the wall outside of the convenience store. She was not sure whether defendant or Rasu fired first. Ms. Goodman also stated that she and defendant briefly dated in the past.

¶ 13    A jury found defendant guilty of first degree murder. The court sentenced defendant to 40 years in prison. Defendant appealed. On direct appeal, we affirmed defendant's conviction and sentence. *People v. Blalock*, 331 Ill. App. 3d 1126 (2002) (table) (unpublished order under Illinois Supreme Court Rule 23). Defendant did not seek leave to appeal from the Illinois Supreme Court.

¶ 14    Defendant filed a postconviction petition a year after his appeal was unsuccessful. In his postconviction petition, defendant alleged that he was actually innocent, that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), for not disclosing the existence of a potential eyewitness, and that his trial counsel was ineffective for failing to present mitigating evidence during sentencing. The trial court dismissed defendant's postconviction petition, holding that the petition presented a claim of self-defense—a claim that was already presented to, and rejected by, the jury. Defendant did not appeal the dismissal of his postconviction petition.

¶ 15    Defendant filed a second postconviction petition in 2009. In his second postconviction petition, defendant argued that he was denied effective assistance of counsel in the presentation of his first postconviction petition because his counsel failed to file an appeal. The trial court denied defendant leave to file his successive petition. Defendant appealed, and we affirmed. *People v. Blalock*, 2014 IL App (1st) 102685-U, ¶ 35. The Illinois Supreme Court denied defendant's petition for leave to appeal. *People v. Blalock*, No. 118294 (Ill. Nov. 26, 2014) (supervisory order).

¶ 16    Defendant filed a third postconviction petition in 2016. His third postconviction petition is the petition now at issue. In his third petition, defendant alleges for the first time since before his trial that his confession was involuntary as it was the result of physical coercion. Defendant alleges that the detectives physically and mentally abused him, in that they yelled at him, slapped him in the head, beat and kicked him, bent and split his fingernails, and put a gun to his head, among other things. Defendant also points out that the detectives that conducted his interrogation—Detectives James O'Brien, John Halloran, and John Murray—have been accused of misconduct in several other investigations. Defendant attached to his petition affidavits from other alleged victims of these detectives, a report from a Special State's Attorney that investigated allegations against these officers, a *Chicago Tribune* article about the detectives, and police department internal affairs memoranda.

¶ 17    The trial court denied defendant leave to file his third postconviction petition. The trial court held that defendant's claims failed to satisfy the "cause and prejudice test"—the test that courts use to determine whether belated claims made in a successive postconviction petition should receive review (725 ILCS 5/122-1(f) (West 2018)). Defendant now appeals the trial court's denial of his motion for leave to file a third postconviction petition.

¶ 18                                      II. ANALYSIS

¶ 19    Defendant argues that his claim that his confession was coerced satisfies the "cause and prejudice test," therefore meeting the criteria to go forward on a successive postconviction petition. Thus, defendant contends that the trial court should not have denied him leave to file a third postconviction petition.

¶ 20    The Post-Conviction Hearing Act provides a method by which defendants may assert that, in the proceedings that resulted in their convictions, there was a substantial denial of their federal or state constitutional rights. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). Postconviction proceedings are not a substitute for an appeal but, rather, constitute a collateral attack on a final

judgment. *People v. Davis*, 2014 IL 115595, ¶ 13. A postconviction proceeding allows inquiry only into constitutional issues that were not and could not have been adjudicated on direct appeal. *People v. Williams*, 394 Ill. App. 3d 236, 242 (2009). Therefore, where a petitioner has previously taken an appeal from a judgment of conviction, the ensuing judgment of the reviewing court will bar, under the doctrine of *res judicata*, postconviction review of all issues actually decided by the reviewing court and any other claims that could have been presented to the reviewing court will be deemed waived. *People v. Edwards*, 2012 IL 111711, ¶ 21; see also 725 ILCS 5/122-3 (West 2018) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended [postconviction] petition is waived.").

¶ 21    Under the Code of Criminal Procedure of 1963, petitioners are entitled to file only one postconviction petition, and any subsequent petitions are allowed only with leave of court. 725 ILCS 5/122-1(f) (West 2018). Leave of court may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial postconviction proceedings and prejudice results from that failure. *Id.*

¶ 22    For purposes of deciding whether leave to file a successive postconviction petition should be granted, a petitioner shows "cause" by "identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." *Id.* A petitioner shows "prejudice" by "demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id.*

¶ 23    Successive postconviction petitions are disfavored by Illinois courts. *Edwards*, 2012 IL 111711, ¶ 29. A petitioner must meet a higher burden to go forward on a successive postconviction petition than he must meet at the first stage of original postconviction proceedings. *Id.* ¶¶ 25-29. We review *de novo* whether a petitioner has sufficiently alleged cause and prejudice so as to be entitled to file a successive petition. *People v. Womack*, 2020 IL App (3d) 170208, ¶ 12.

¶ 24    Defendant argues that his allegations of police misconduct, along with the evidence attached to his petition that the detectives involved in his interrogation have been accused of misconduct in other cases, meet the threshold for going forward on a successive postconviction petition. Defendant contends that he demonstrated "cause" for not raising the issue of a coerced confession in his original postconviction petition because the evidence he has submitted in support of his current petition was not available at the time that he filed his first postconviction petition. Defendant argues that he demonstrated "prejudice" because the confession was introduced as substantive evidence at trial, and the use of a coerced confession against a defendant necessarily deprives that defendant of due process.

¶ 25    As to the "cause" prong of the test to determine whether a successive postconviction petition should be allowed, defendant argues that the evidence he now uses to support his claim was not available when he filed his original postconviction petition. However, defendant did not even make *the claim* that his confession was coerced in his original petition. Defendant's current allegations demonstrate that he was aware of the facts giving rise to his coercion claim when he filed his original postconviction petition. Despite his awareness of these alleged facts, defendant made no mention of a coerced confession in his original petition. In fact, defendant did not raise the issue at trial, on direct appeal, in his first postconviction petition or in his second postconviction petition. Defendant did not raise the issue of a coerced confession for 16 years after he was convicted. Nothing prevented defendant from raising such a claim at any

of those stages. Regardless of the availability of the corroborating evidence he now uses, the claim itself was clearly available to defendant, but he did not assert it.

¶ 26　　Defendant maintains that the "corroborating evidence" was either not yet in existence or that he did not have knowledge of it when he filed his first postconviction petition, so he has established "cause" under the cause and prejudice test. But to establish "cause" in the successive postconviction context, a petitioner is required to "identify[ ] an objective factor that impeded his or her ability to raise a specific *claim* during his or her initial post-conviction proceedings." (Emphasis added.) 725 ILCS 5/122-1(f) (West 2018). The statute discusses not when the documentation to support a claim becomes available, but whether the claim itself can be made. Defendant could have made *the claim* of a coerced confession at any time—he was obviously aware of the facts that might give rise to such a claim. No objective factors impeded defendant's ability to raise the claim of a coerced confession in his direct appeal or in his first or second postconviction petition. See *Davis*, 2014 IL 115595, ¶ 55.

¶ 27　　Defendant is not arguing that the now-available evidence would have corroborated the claims he made in his original petition; he is instead arguing that he would have made different claims. So even though defendant has established "cause" for not providing at least some of the evidence he now relies upon, he has not established any cause for failing to make the claim altogether. Defendant has not provided any explanation regarding why he did not or could not have argued that his confession was coerced in any of the prior proceedings.

¶ 28　　A petitioner does not need to be aware of all possible existing evidence that might support a constitutional claim in order to have been obligated to raise the claim in an initial postconviction petition. See *Williams*, 394 Ill. App. 3d at 242. Here, as in *Williams*, "[t]he lack of the supporting documentation did not prevent the defendant from raising these claims in his original postconviction petition." *Id.* at 245; 725 ILCS 5/122-2 (West 2018). Neither the factual nor the legal basis of the claim defendant now raises was unavailable to him when he filed his initial postconviction petition.

¶ 29　　As defendant tacitly acknowledges, not only would he have been aware of his own allegations of coercion, much of the evidence he now uses to support his claims was available when he filed his first or second postconviction petition. Defendant could well have supported his current claim of coercion based on evidence that was available at the time. See *People v. Anderson*, 375 Ill. App. 3d 990, 1001-05 (2007). Defendant has failed to demonstrate cause for failing to raise the issue of a coerced confession for 16 years following his conviction, and he has failed to demonstrate any basis to avoid the application of waiver and *res judicata* principles. See *People v. Orange*, 168 Ill. 2d 138, 154 (1995).

¶ 30　　In addition, defendant had a hearing on the issue of a coerced confession before trial. The trial court assessed the credibility of the detective that defendant called to testify, and at the conclusion of the evidence, the circuit court found defendant's claim of coercion was "disproved." Defendant appealed his conviction. He could have raised the issue of a coerced confession or the denial of his motion to suppress his confession on direct appeal, but he did not. This issue clearly could have been adjudicated on direct appeal. See *Williams*, 394 Ill. App. 3d at 246. Without something more than generalized allegations of abuse in other cases, the same arguments already raised and rejected by the court and not raised in an appeal do not state an adequate basis for going forward on a successive postconviction petition. *Orange*, 168 Ill. 2d at 154-55; *People v. Blair*, 215 Ill. 2d 427, 446 (2005).

¶ 31        Defendant also testified at trial. The circumstances of his confession were a major topic at trial. But defendant never stated that he was tortured or that he was otherwise coerced into giving the statement that he gave. He instead testified under oath that he made the statement at issue to detectives and that no one threatened him to get him to say what he said. Defendant testified that he made the statement, not because he was tortured, but because the detectives would not accept his narrative, so he told them what they wanted to hear. Defendant testified that, as for his version of events, the detectives were "[not] trying to hear that part of the story there" and that what he told the detectives, "it was a story, I was just, you know, lying about [it], and they [were] going to go along with it." Defendant further testified at trial that he was left alone with the assistant state's attorney when she asked him how he was treated by the detectives and when he related to her that he had been treated well by the detectives. Defendant explicitly testified at trial that he was not abused for the purposes of obtaining his statement and that no one threatened him to make him say any part of his statement.

¶ 32        Defendant made clear at trial that the motivation he had for giving the confession was not because he was tortured, but that he gave the statement that he did give because the detectives were not willing to accept his narrative of the events. Because the detectives were not accepting his story, he made up the version that was memorialized. At trial, defendant testified that the statement he gave to police was a fabrication, but he made clear that the reason for the fabrication was to appease the investigators and, according to defendant's own trial testimony, not because he was abused. Defendant's current claims are rebutted by his own admissions in the record, which defendant made under oath. See *People v. Jefferson*, 345 Ill. App. 3d 60, 75-76 (2003); *People v. Shotts*, 2015 IL App (4th) 130695, ¶¶ 69-71.

¶ 33        Unlike the petitioners in some other cases in which our courts have grappled with belated claims of police coercion in an interrogation, defendant has not been consistent in claiming that he was the victim of police misconduct. See, *e.g.*, *People v. Patterson*, 192 Ill. 2d 93, 145 (2000). Instead, defendant raises the claim now for the first time in 16 years, after having several available proceedings in which he could have raised it. Again, defendant provides no explanation for not raising the issue itself in either his direct appeal or his original postconviction, other than to say that some of the corroborating evidence only became available after his original petition was filed.

¶ 34        Defendant points to our decision in *People v. Wrice*, 406 Ill. App. 3d 43 (2010), *aff'd as modified*, 2012 IL 111860, to support his argument that "cause" has been established for his coercion claim. However, in *Wrice*, the petitioner had alleged consistently in each of his postconviction filings that his confession was the product of police torture. *Id.* at 52. Defendant has not. So like in *Wrice*, we agree with defendant that he has established cause for not presenting some of his evidentiary material at a prior time. See *supra* ¶ 27. But defendant has not established cause for failing to raise the claim altogether in several prior filings in the circuit court and in this court.

¶ 35        Defendant's position boils down to a claim that any petitioner who alleges that he was interrogated by the same detectives that are accused of misconduct in other cases has stated a colorable claim for constitutional relief, regardless of the procedural posture of the case. But that is not the standard. Merely supplying evidence that detectives involved in defendant's interrogation have been accused of misconduct in other cases does not demonstrate that defendant's statement was, in fact, coerced, especially in light of the entire record in this case. See *Anderson*, 375 Ill. App. 3d at 1001-03; *People v. Gonzalez*, 2016 IL App (1st) 141660,

¶ 58. The trial court did not err in denying defendant leave to file a third postconviction petition on his claim that his confession was coerced.

¶ 36    As to defendant's claim for a violation of *Brady*, defendant argues that the State violated the dictates of that case when it failed to disclose to defendant the detectives' history of abuse. In *Brady*, 373 U.S. at 87, the Supreme Court of the United States announced a rule that the suppression of evidence by the government that is favorable to a defendant violates due process. That rule has been expounded upon by Illinois courts and is expressed in Illinois Supreme Court Rule 412(c) (eff. Mar. 1, 2001) which, among other things, requires the State to "disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or which would tend to reduce his punishment therefor." Defendant argues that the State should have disclosed evidence of the allegations of misconduct against Detectives O'Brien and Halloran before trial because such evidence would have been favorable to his defense.

¶ 37    Defendant acknowledges that our supreme court rejected the same argument he now raises in its decision in *People v. Orange*, 195 Ill. 2d 437 (2001). Defendant nonetheless contends that, in light of recent revelations of widespread police misconduct related to confessions, "that case should no longer be followed." What defendant fails to acknowledge is that we are bound by decisions of the supreme court. See *Yakich v. Aulds*, 2019 IL 123667, ¶ 13 ("circuit and appellate courts are bound to apply this court's precedent to the facts of the case before them under the fundamental principle of *stare decisis*" and failing to do so is "serious error"); see also *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 72. Furthermore, which is applicable again, defendant did not raise the claim he now raises in his original petition, even though the claim itself and at least some of the supporting evidence was discoverable. *Anderson*, 375 Ill. App. 3d at 1011; *Williams*, 394 Ill. App. 3d at 242.

¶ 38    Defendant's *Brady* claim is essentially that he would have provided different trial testimony had he known about the allegations of misconduct against the detectives—that, had he been provided evidence of the allegations against the detectives, instead of trying to persuade the jury that he fired in self-defense, he would have made the case that his confession was coerced. That is not the purpose of *Brady*. Defendant's trial testimony stands in direct contradiction of the claims he asserts here. Defendant testified that he crafted a fabricated statement to the police because it was what they wanted to hear. And he affirmatively testified that he was not threatened to make any particular statement. The trial court did not err in denying defendant leave to file a third postconviction petition on the basis of a violation of *Brady*.

¶ 39                                III. CONCLUSION

¶ 40    Accordingly, we affirm.

¶ 41    Affirmed.